**THE TRUSTEES OF THE AMAL-
GAMATED INSURANCE
FUND, Plaintiff,**

v.

**CROWN CLOTHING, INC., Defendants.**

No. CIV. A. 97–5821(SSB).

United States District Court,
D. New Jersey.

Nov. 16, 1998.

Jack Goldstein, Goldstein & Wallman, Matawan, NJ, for Plaintiff.

Jeffrey I. Pasek, Mark C. Stephenson, Cozen and O'Connor, Philadelphia, PA, for Defendants.

## OPINION ON MOTION FOR SUMMARY JUDMENT AND FOR SANCTIONS

BROTMAN, District Judge.

Presently before this Court is the motion of plaintiff The Trustees of the Amalgamated Insurance Fund ("Trustees") for summary judgment and for sanctions.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

The Amalgamated Insurance Fund ("Fund") is a multiemployer trust fund established to provide retirement benefits to eligible employees of employers obligated by the terms of certain collective bargaining agreements. *See* Burker Aff., ¶ 2. As of June 1,

1991, Crown Clothing Company ("Crown") was a participating employer in the Fund.[1] In June of 1991 a labor dispute existed between Crown and Baltimore Region Joint Board, Amalgamated Clothing and Textile Workers Union, ALF–CIO–CLC ("Union") regarding whether Crown would continue to participate in the Fund's health and welfare benefit plan pursuant to the Union's proposed collective bargaining agreement. *See* Crown Clothing Company's Memorandum of Law in Opposition to Summary Judgment ("Opposition Brief"), Exhs. 1, 2. Crown has submitted evidence to show that the Union attempted to pressure it into signing the proposed agreement by threatening to impose withdrawal liability if Crown did not sign by June 14, 1991. *See id.*, Exh. 14. Crown did not sign the agreement as of that date. *See id.*

On June 17, 1991, the Union advised Crown by facsimile that it was renouncing its representation of Crown's employees. *See id.*, Exh. 15. On June 18, 1991, the Fund notified Crown by letter that it had incurred withdrawal liability as a result of the Union's renunciation of representation in the amount of $621,102.14. *See* Burker Aff., Exh. A. The Fund provided Crown with evidence of the calculations it performed to make this determination and indicated a schedule of payments.[2] *See id.* On October 31, 1991, the Fund notified Crown by letter that it had incorrectly calculated Crown's withdrawal liability. *See id.*, Exh. B. The Fund provided evidence of the calculations its performed to determine that Crown had actually incurred withdrawal liability in the amount of $623,-980.31, some $2,878.17 more than the Fund originally indicated. *See id.* The Fund also explained that its error would not change the size or number of Crown's quarterly payments, with the exception of Crown's final

payment which would be $5,197.63. *See id.* On October 31, 1991, Crown commenced interim liability payments. *See* Declaration of Howard Levin ("Levin Declaration"), ¶ 2. Crown made the quarterly payments due on and prior to November 1, 1996. *See id.*, ¶ 3; Burker Aff., ¶ 12. Crown did not make the quarterly payments due on February 1, 1997, May 1, 1997, August 1, 1997, November 1, 1997, and February 1, 1998. *See* Burker Aff., Exhs. D, F. The Fund notified Crown of each of its defaults, and more than 60 days have elapsed since each notification. *See id.*

On October 31, 1991, Crown commenced arbitration proceedings to dispute its withdrawal liability. *See* Burker Aff., ¶ 9. On June 18, 1992, Crown filed suit in this Court against (1) the Union; (2) Carmen Papale, the Union's manager; (3) the Fund; (4) Amalgamated Life Insurance Company ("Amalgamated"), the Fund's administrator; and (5) Jeffrey Warbet, the vice president of Amalgamated. *See Crown Clothing Company v. Papale*, 854 F.Supp. 316, 317 (D.N.J. 1994). The complaint challenged the Fund's imposition of withdrawal liability. *See id.* at 318. It contained five counts; the Court ordered that three be dismissed, one be sent to arbitration, and one be stayed pending arbitration. *See id.* at 323.[3] Since the Court issued its order on June 10, 1994, there has been only one day of testimony before the American Arbitration Association ("Association"). *See* Warbet Aff., ¶ 5. This testimony took place on September 5, 1995. *See id.* On October 15, 1997, the Association contacted both Crown's and the Fund's attorneys by letter to request that the parties update the Association regarding the status of the dispute. *See* Burker Aff., Exh. C. On January 14, 1998, Crown's attorney wrote the Associa-

1. The Trustees named Crown Clothing, Inc. as the defendant in this action. In their reply brief, the Trustees stated that this was error. *See* Reply Brief Submitted by Plaintiff in Support of its Motion for Summary Judgment and for Sanctions ("Reply Brief") at 10. They indicated that the correct defendant is Crown Clothing Company and asked the Court for leave to amend their complaint to reflect this change. *See id.* The Court will address this request infra.

2. Crown was to make 27 quarterly payments of $30,162.16 each and one final payment of

$422.60. *See* Burker Aff., Exh. A. August 1, 1991 was to be the date of the first installment. *See id.*

3. The count which the Court ordered to arbitration involved the question of whether withdrawal liability should have been imposed at all. *See Papale*, 854 F.Supp. at 318, 323. The Count which the Court ordered stayed pending arbitration involved the question of whether the Fund breached its fiduciary duty by conspiring with the Union and by failing to investigate Crown's claim that a labor dispute led to its withdrawal from the Fund. *See id.*

tion to request that the arbitration proceed. *See id.,* Exh. E.

On November 24, 1997, the Trustees filed their complaint in the instant action to collect the quarterly withdrawal liability payments Crown had failed to make while arbitration was pending. The Trustees seek full payment of the unpaid balance of Crown's withdrawal liability in the amount of $156,008.43 together with accrued interest and liquidated damages in the amount of 20 percent. Crown also seeks reimbursement for its costs and attorney's fees in connection with this action. Crown filed its answer on January 5, 1998. On June 1, 1998, the Trustees filed a motion for summary judgment and for sanctions.

## II. *DISCUSSION*

### A. AMENDING THE CAPTION

▮ In their reply brief, the Trustees ask the Court for leave to amend their complaint to change the caption from "Crown Clothing, Inc." to "Crown Clothing Company." *See* Reply Brief Submitted by Plaintiff in Support of its Motion for Summary Judgment and for Sanctions ("Reply Brief") at 10. Fed.R.Civ.P. 15(a) provides that, after a responsive pleading has been served, a party may amend its pleading by leave of court which "shall be freely given when justice so requires." This rule reflects a general presumption in favor of permitting parties to amend their pleadings. *See Commodity Futures Trading Comm'n v. Am. Metal Exchange Corp.,* 693 F.Supp. 168, 189 (D.N.J. 1988). Permission should be denied only where a clear reason exists for doing so:

> [Such reasons include] undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

Crown has failed to produce any evidence that these adverse effects would result if the Court were to grant the Trustees' request to amend their pleadings. According to the Trustees, Crown has not been prejudiced by the Trustees' error. The notices the Trustees sent to inform Crown of its failure to make timely withdrawal liability payments were all addressed to Crown Clothing Company. *See* Warbet Aff., ¶ 4. Crown filed an answer to the complaint which named Crown Clothing, Inc. as the defendant. Crown also filed a response to the Trustees' summary judgment motion which named Crown Clothing, Inc. as a defendant. These actions indicate that Crown knew that the Trustees intended to sue Crown Clothing Company despite the fact that the name on the Trustees' pleadings was Crown Clothing, Inc. Because Crown Clothing Company responded to the Trustees' pleadings which incorrectly named Crown Clothing, Inc. as a defendant, it is clear that Crown suffered no harm as a result of the Trustees' error. Therefore, the Court gives the Trustees leave to amend their complaint as requested. The defendant in this matter will hereafter be known as Crown Clothing Company.

### B. STANDING

▮ In opposing the Trustees' motion for summary judgment, Crown argues that the Trustees lack standing to bring this lawsuit. *See* Opposition Brief at 14–17. This action is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1381, et seq. ("MPPAA"). Pursuant to 29 U.S.C. § 1132(a)(3) (West 1985), a fiduciary may sue to enforce the statute's provisions regarding withdrawal liability.[4] ERISA defines fiduciary as follows:

4. This section reads as follows:
   A civil action may be brought ... by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any

   provisions of this subchapter or the terms of the plan.
   29 U.S.C.A. § 1132(a)(3). MPPAA requires that employers make interim withdrawal liability payments while their withdrawal liability is pending before an arbitrator. *See* 29 U.S.C.A. § 1401(d). Therefore, a fiduciary has standing to sue to

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C.A. § 1002(21)(A) (West Supp.1998). The Third Circuit has found that under this definition "fiduciary status is not an all or nothing concept. . . . [A] court must ask whether a person is a fiduciary with respect to the particular activity in question." *Moench v. Robertson,* 62 F.3d 553, 561 (3rd Cir.1995), *cert. denied,* 516 U.S. 1115, 116 S.Ct. 917, 133 L.Ed.2d 847 (1996) (citations omitted).

In their complaint, the Trustees allege that they are multiemployer plan sponsors. *See* Complaint, ¶ 5. The Third Circuit has found that plan sponsors are fiduciaries to the extent that they act in a fiduciary capacity. *See Bollman Hat Co. v. Root,* 112 F.3d 113, 115 (3rd Cir.), *cert. denied,* — U.S. —, 118 S.Ct. 373, 139 L.Ed.2d 290 (1997). Plan sponsors act in a fiduciary capacity when executing the statute's withdrawal liability provisions. ERISA requires that upon an employer's withdrawal from a multiemployer plan, the plan sponsor must determine the amount of the employer's withdrawal liability, notify the employer of this amount, and collect it. *See* 29 U.S.C.A. § 1382 (West 1985). Although the plan sponsor's determination of the liability amount is constrained by the statute, the Third Circuit has found that plan sponsors have "wide and significant discretion" in this regard. *United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.,* 787 F.2d 128, 140 (3rd Cir.1986), *aff'd,* 481 U.S. 735, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987) (finding that plan sponsors have discretion to pick among the four suggested methods for determining withdrawal liability, to determine the appropriate discount rates, and to decide whether an employer falls under one of several statutory exemptions); *see also Bay Area Laundry*

enforce an employer's obligation to make interim

*and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., Inc.,* 522 U.S. 192, 118 S.Ct. 542, 550, 139 L.Ed.2d 553 (1997) (describing the discretion a plan sponsor has with regard to the time frame in which they must calculate the employer's withdrawal liability). It is this discretion which makes plan sponsors fiduciaries for the purpose of executing the statute's withdrawal liability provisions. Because the Trustees brought the instant lawsuit to ask the Court for assistance with this function, they have standing as fiduciaries.

## C. MOTION FOR SUMMARY JUDGMENT

### 1. Standard for Summary Judgment

The standard for granting a motion for summary judgment is a stringent one, but it is not insurmountable. Fed.R.Civ.P. 56 provides that summary judgment may be granted only when materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Serbin v. Bora Corp.,* 96 F.3d 66, 69 n. 2 (3d Cir.1996). In deciding whether there is a disputed issue of material fact, the court must grant all reasonable inferences from the evidence to the non-moving party. The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Supreme Court decisions mandate that a summary judgment motion must be granted unless the party opposing the motion "provides evidence 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Lawrence v. National Westminster Bank New Jersey,* 98 F.3d 61, 65 (3d Cir. 1996) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to mate-

withdrawal liability payments.

rial facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Serbin,* 96 F.3d at 69 n. 2 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 500 (3d Cir.1991) (declaring that non-movant may not "rest upon mere allegations, general denials, or ... vague statements"). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

### 2. Interim Withdrawal Liability

■ The Trustees argue that they are entitled to judgment as a matter of law because MPPAA obligates Crown to make interim withdrawal liability payments while arbitration is pending. There are many provisions within ERISA and MPPAA governing withdrawal liability. The following excerpt from a recent Third Circuit opinion provides some background regarding how those provisions operate:

> An employer withdraws from a multiemployer pension plan when the employer either permanently ceases to have an obligation to contribute under the plan or permanently ceases all covered operations under the plan. 29 U.S.C. § 1383(a). The employer is liable for its share of the plan's unfunded vested benefits as calculated at the time of withdrawal. 29 U.S.C. §§ 1381, 1383, 1391; Concrete Pipe & Products v. Construction Laborers Pension Trust, 508 U.S. 602, 609, 113 S.Ct. 2264,

2272, 124 L.Ed.2d 539 (1993). The plan sponsor has the responsibility of determining this withdrawal liability, notifying the employer and collecting payment. 29 U.S.C. § 1382. If the employer disputes the amount set, it may ask the plan sponsor to conduct a reasonable review of the computed liability. 29 U.S.C. § 1399(b)(2)(A). In the event the dispute is unresolved, either party may request arbitration. 29 U.S.C. § 1401(a)(1). The arbitrator's award, in turn, may be challenged in federal court. 29 U.S.C. § 1401(b)(2).

> *Galgay v. Beaverbrook Coal Co.,* 105 F.3d 137, 138–39 (1997). MPPAA instructs employers to begin making withdrawal liability payments within 60 days after notification of liability. *See* 29 U.S.C.A. § 1399(c)(2) (West 1985).[5] Employers must make these payments even if they elect to arbitrate their liability. *See* 29 U.S.C.A. § 1401(d) (West 1985).[6] If the arbitrator later determines that the employers overpaid, they are reimbursed. *See id.* If an employer fails to make a payment and does not cure its default within 60 days after it receives written notification thereof, a plan sponsor may require that the employer pay the outstanding amount of its withdrawal liability plus accrued interest on the total outstanding liability from the due date of the first payment which the employer failed to make. *See* 29 U.S.C.A. § 1399(5) (West 1985). If an employer remains in default, a plan sponsor may bring suit in federal or state court to compel withdrawal liability payments. *See* 29 U.S.C.A. § 1451(b) & (c) (West 1985).

This "pay now, dispute later" scheme is consistent with the purpose for which Congress enacted MPPAA:

> Congress enacted MPPAA out of concern that multiemployer pension plans would

---

**5.** This provision states as follows:

> Withdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor ... beginning no later than 60 days after the date of the demand notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.

29 U.S.C.A. § 1399(c)(2).

**6.** This provision states as follows:

> Payments shall be made by an employer in accordance with the determinations made under this part until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination.

29 U.S.C. § 1401(d).

collapse as employers withdrew if the remaining contributors became too few in number to pay the unfunded vested benefits. Congress foresaw that the purpose of MPPAA would be undermined if employers could postpone paying their debts to pension funds by engaging in protracted litigation over withdrawal liability. Therefore, the statute directs employers to begin payments upon notification of withdrawal liability, whether or not they choose to dispute the determination.

*Galgay,* 105 F.3d at 139 (citations omitted). Despite the policy considerations which informed Congress' actions, the Fifth and Seventh Circuits have recognized an equitable exception to the requirement that employers make interim withdrawal liability payments while awaiting arbitration. *See Trustees of Plumbers and Pipefitters Nat'l Pension Fund v. Mar–Len, Inc.,* 30 F.3d 621, 626 (5th Cir.1994) (recognizing an equitable exception if the pension fund's claim is frivolous and non-colorable); *Trustees of the Chicago Truck Drivers Pension Fund v. Rentar Industries, Inc.,* 951 F.2d 152, 155 (7th Cir. 1991) (recognizing an equitable exception if "the employer makes an affirmative showing that the pension fund lacks a colorable claim" and if making interim payments will irreparably harm the employer and his business).

The Third Circuit has never recognized such an exception. *See Galgay,* 105 F.3d at 140 ("We have never held that there are any equitable exceptions to the statutory provisions on interim payments, and we decline to do so now.") *Galgay* is the most recent case decided by the Third Circuit which involved interim withdrawal liability payments. While the Third Circuit did not adopt an equitable exception in *Galgay,* it did assess the force of the reasoning employed by the Fifth and Seventh Circuits in creating equitable exceptions to MPPAA's interim withdrawal liability requirements. *See id.* at 141. The Third Circuit agreed with the conclusion of these other courts that it is inappropriate to grant equitable relief from interim withdrawal liability payments solely based on an employer's demonstration that making such payments would cause it irreparable harm:

> [W]ithdrawing employers are often financially troubled companies. If such companies are allowed to defer paying their debt to the pension funds, and go out of business while liability is being litigated, the pension funds will be saddled with full liability for the unfunded pension benefits. The interim payment provisions are designed to diminish this risk.

*Id.* at 141 (citations omitted). The *Galgay* court acknowledged that both the Fifth and Seventh Circuits will only consider an employer's irreparable injury after the employer demonstrates that the pension fund's claim for withdrawal liability is not colorable. *See id.* at 140–41. The court neither expressed approval nor disapproval of this brand of equitable exception—one based on an employer's showing both that a fund's withdrawal liability claim is non-colorable and that making withdrawal liability payments would cause it irreparable harm. The court did, however, explain the rational behind such an exception:

> These circuits have adopted the equitable exception solely to ensure that the courts are not used by an unscrupulous pension fund lacking a legitimate withdrawal liability claim to squeeze money from an employer and propel it into bankruptcy.

*See id.* at 141 (citations omitted). The *Galgay* court found that the facts of the case before it did not provide an occasion for considering whether to adopt an equitable exception similar to that adopted by the Fifth and Seventh Circuits: the employer did not demonstrate that the pension fund's claim was non-colorable and did not show that it would suffer irreparable harm if it were forced to make interim withdrawal liability payments. *See id.*

Heeding the words of the *Galgay* court, Crown argues that the Trustees' claim is noncolorable and that it will suffer irreparable harm if forced to make interim withdrawal liability payments. *See* Opposition Brief at 27–31. Crown argues that this case presents the perfect opportunity to adopt an equitable exception similar to that embraced by the Fifth and Seventh Circuits. *See id.* at 27. The Court disagrees. Crown has failed to provide any evidence that the Trustees'

claim is non-colorable. A claim is colorable if it is more likely than not to have some merit. *See Mar–Len,* 30 F.3d at 626, n. 11. Crown argues that the Trustees' claim for interim withdrawal liability payments is non-colorable because the Trustees forced Crown's withdrawal from the fund and imposed withdrawal liability on Crown in an attempt to pressure Crown into accepting a collective bargaining agreement. *See* Opposition Brief at 27–28.

Even if the Trustees acted pursuant to this sort of motive when they imposed withdrawal liability on Crown, Crown must still pay some amount of the withdrawal liability. The Pension Benefit Guarantee Corporation ("PBGC")[7] has labeled the type of forced withdrawal Crown claims it suffered at the Trustees' hands "union-mandated withdrawal."[8] In 1991, the PBGC prepared a report regarding this phenomenon at Congress' request. *See* Opposition Brief, Exh. 34, *Union–Mandated Withdrawal Study Report,* March 1991. The PBGC found that union-mandated withdrawals are rare and consequently recommended that Congress not spend time promulgating special withdrawal liability rules to govern them. *See id.* at 15–16. Recognizing that Congress might elect to do so despite the PBGC's recommendation, the PBGC discussed several guidelines to assist Congress in drafting such rules. In its discussion, the PBGC warned against completely relieving employers from their withdrawal liability obligations if their withdrawals were union-mandated:

For several reasons, the PBGC believes that any special rules intended to grant relief for a union-mandated withdrawal cannot be based on the total forgiveness of all withdrawal liability.... To do so would unjustly enrich the employer, who has received the benefit of coverage for its employees while the collective bargaining agreement was in effect, without paying its full share of the cost of the benefits that were earned. Additionally, the possibility of total forgiveness of liability could create incentives for employers to adopt intransigent positions in collective bargaining in hopes that the union would eventually "walk away" or, at a minimum, lead employers to engage in drawn-out disputes over withdrawal liability assessments in the hope that an arbitrator would find that the withdrawal was union-mandated. Finally, total forgiveness of liability is not appropriate because the burden of making up what was not paid by the withdrawing employer would fall on the remaining employers, through increased contributions, on the participants, through fewer benefits, and on the PBGC's insurance program.

*Id.* at 17–18. In the event of a union-mandated withdrawal, the PBGC suggested that the employer be required to pay a portion of the withdrawal liability it would otherwise be required to pay had its withdrawal occurred under other circumstances. *See id.* at 20 (summarizing three possibilities for making withdrawal liability computations in the event

7. In cases involving ERISA and MPPAA, courts should consider the PBGC's views. The Supreme Court has found that "[f]or a court to attempt to answer these questions without the views of the agencies responsible for enforcing ERISA, would be to 'embar[k] upon a voyage without a compass.'" *Mead Corp. v. B.E. Tilley,* 490 U.S. 714, 726, 109 S.Ct. 2156, 104 L.Ed.2d 796 (1989) (quoting *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 568, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980)).

8. The PBGC has defined union-mandated withdrawal as follows:

[T]he most supportable definition of a union-mandated withdrawal would require that (1) a union voluntarily (e.g., without the coercion of any employer unfair labor practices) disclaim its status as the recognized bargaining agent

for a group of employees, and (2) the plan refuses to accept the continued contributions that are proffered by the employer.

Opposition Brief, Exh. 34, *Union Mandated Withdrawal Study Report* at 13. Although this definition contains two prongs, the one case which the PBGC found to involve a union-mandated withdrawal only satisfied the first prong of this definition. *See id.* at 14–15 (finding that *Western Teamsters Pension Fund v. Thompson Building Materials,* 749 F.2d 1396, 6 E.B.C. 1233 (9th Cir.1984), involved a union-mandated withdrawal). In that case, an employer ceased fund contributions and incurred withdrawal liability after allegedly being notified by its union that it disclaimed any interest in continuing to represent the employer's employees. *See id.* This is precisely what Crown claims happened in the case presently before the Court. *See* Opposition Brief at 5.

of a union-mandated withdrawal). The PBGC's guidelines regarding relief from liability in the context of union-mandated withdrawals make it more likely than not that an arbitrator will find Crown obligated to pay some amount of withdrawal liability. Therefore, the Trustees' claim for withdrawal liability against Crown is colorable.

■ Because Crown has failed to provide evidence that the Trustees' claim is non-colorable, the Court need not determine whether to adopt an equitable exception to MPPAA's interim withdrawal liability payment requirements. In *Galgay*, the Third Circuit rejected the possibility that the threat of irreparable harm to an employer was alone sufficient to warrant equitable relief from interim withdrawal liability payments. *See Galgay*, 105 F.3d at 141 (discussed *supra*, at 513–14). Therefore, even if the Court found that Crown would suffer such harm were it forced to make interim payments, it could not relieve Crown from its obligation based on this fact alone. The *Galgay* court left open the possibility that equitable relief from interim payments could be granted to an employer who demonstrated that a fund's withdrawal liability claim against it was non-colorable. *See id.* at 140–41. Because Crown has failed to provide any evidence indicating that the Trustees' claim is non-colorable, the Court cannot grant Crown equitable relief from its interim payment obligations. Crown must therefore pay to the Trustees $156,008.43,[9] the outstanding amount of its withdrawal liability.

### 3. Interest, Liquidated Damages, Costs, and Attorney's Fees

■ The Trustees have asked that the Court not only award it the outstanding amount of Crown's withdrawal liability but also interest on this amount, liquidated damages, costs, and attorney's fees. *See* Plaintiff's Brief at 10–11. The relevant costs

9. Crown owes the Fund five payments of $30,162.16 and one payment of $5,197.63.

10. 29 U.S.C.A. § 1451(b) (West 1985) provides as follows:
In any action under this section to compel an employer to pay withdrawal liability, any failure of the employer to make any withdrawal liability payment within the time prescribed

provision for actions to compel withdrawal liability payments pursuant to 29 U.S.C.A. § 1451 is 29 U.S.C.A. § 1132(g)(2) (West 1985).[10] *See Trustees of the Amalgamated Ins. Fund v. Sheldon Hall Clothing, Inc.*, 862 F.2d 1020, 1023 (3rd Cir.1988). This provision states as follows:

(2) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—

(A) the unpaid contributions,

(B) interest on the unpaid contributions,

(C) an amount equal to the greater of—

(i) interest on the unpaid contributions, or

(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and

(E) such other legal or equitable relief as the court deems appropriate.

For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26.

29 U.S.C.A. § 1132(g)(2).

The Fund's Plan Rules provide that an employer who fails to contribute to the Fund will be liable for the amount of the delinquent contributions plus the following additional costs:

(1) interest at the rate of 10% on all sums due,

shall be treated in the same manner as a delinquent contribution (within the meaning of section 1145 of this title).
29 U.S.C.A. § 1132(g)(2) governs the award of interest, liquidated damages, costs, and attorneys' fees in actions involving delinquent contributions.

(2) liquidated damages at the rate of 10% on all sums due,

(3) attorney's fees and costs of the proceeding, and

(4) such other legal and equitable relief as is deemed appropriate.

Burker Aff., Exh. G, The Retirement Fund of the Amalgamated Insurance Fund, Plan Rules at 12. Pursuant to the Plan Rules, interest accrues from the date on which the obligation became delinquent. *See id.* Crown's obligation became delinquent on February 1, 1997. Crown therefore owes the Fund interest in the amount of $28,423.45 [11] plus such additional simple interest at the rate of 10 percent per annum which may accrue between the date of judgment and the date of payment. Crown must also pay to the Fund $15,600.84 in liquidated damages.[12] Finally, Crown must pay the fees and costs incurred by the Trustees's attorneys in preparing this action. The Court will direct the Trustees's counsel to submit an application for this award.

### D. MOTION FOR SANCTIONS

■ In its answer, Crown denies paragraphs 20 and 21 of the Trustees' complaint. The Trustees have asked the Court to impose sanctions on Crown because its denial of these paragraphs constitutes an abuse of process. *See* Brief Submitted by Plaintiff in Support of its Motion for Summary Judgment and for Sanctions ("Trustees' Brief") at 12. Paragraph 20 states that Crown made the quarterly withdrawal liability payments due on and prior to November 1, 1996. Although Crown's answer contains a denial of this statement, the Levin Declaration submitted in support of Crown's Opposition Brief acknowledges that Crown did make these payments. *See* Levin Declaration, ¶¶ 2, 3 ("On October 31, 1991, Crown Clothing Company commenced interim liability payments.... During the course of the arbitration, until precluded by economic hardship ... Crown Clothing Company made timely interim payments.") Paragraph 21 states

that Crown failed to make payments on February 1, 1997, May 1, 1997, August 1, 1997, and November 1, 1997, that the Fund notified Crown of its delinquency, and that Crown failed to cure its default within 60 days of each notification. Crown's answer contains a denial of this paragraph. Levin's Declaration, however, while failing to state on which dates it did not make interim liability payments, concedes that it did at some point stop making such payments. *See id.*

■ While courts have discretion to impose sanctions for a litigant's abuse of process, such discretion should be exercised with restraint. *See In re Tutu Wells Contamination Litigation,* 120 F.3d 368, 383 (3rd Cir.1997). Where a party corrects its errors without causing harm to the other party, sanctions are not appropriate. Although Crown denied paragraphs 20 and 21 in its answer, its submission of the Levin Declaration in opposition to the Trustees' summary judgment motion constitutes a partial admission of the statements contained therein. In addition, the Trustees have not demonstrated that they have suffered any harm as a result of Crown's delay in recognizing its error. Even if Crown had conceded in its answer its failure to make the required quarterly payments, the litigation would have proceeded as it has: with Crown arguing that equitable considerations should excuse it from making the interim payments and with the Trustees arguing the irrelevance of equitable considerations to this matter. Even if Crown had conceded delinquency prior to the filing of the Trustees' complaint, the litigation process would have been the same. For these reasons, the Court finds that sanctions are inappropriate.

### III. CONCLUSION

For the reasons stated above, the Trustees' motion for summary judgment is granted and the Trustees' motion for sanctions is denied. The Court will enter an appropriate order.

---

11. This is the amount of simple interest which has accrued as of November 16, 1998, the date of this opinion.

12. Because the amount of liquidated damages ($15,700.84) is less than the amount of interest which has accrued ($28,423.45), the Court will order Crown to pay the Trustees liquidated damages.

**THIS MATTER** having come before the court on the motion of plaintiff The Trustees of the Amalgamated Insurance Fund ("Trustees") for summary judgment pursuant to Fed.R.Civ.P. 56 and for sanctions;

The Court having reviewed the record and the submissions of the parties;

For the reasons set forth in the Court's opinion of this date;

**IT IS** this *16th* day of November, 1998 **HEREBY**

**ORDERED** that plaintiff Trustees' request for leave to amend its complaint is **GRANTED** and that the defendant in this matter will be known as Crown Clothing Company ("Crown"), not Crown Clothing, Inc.;

**IT IS FURTHER ORDERED** that plaintiff Trustees' motion for summary judgment is **GRANTED** and **JUDGMENT** is entered against defendant Crown;

**IT IS FURTHER ORDERED** that defendant Crown pay to the Amalgamated Insurance Fund: (1) $156,008.43 in outstanding withdrawal liability: (2) $28,423.45 in accrued interest through November 16, 1998; (3) such additional simple interest at the rate of 10 percent per annum which may accrue between the date of this Order and the date of payment; (4) $15,600.84 in liquidated damages; and (5) such attorneys' fees and costs as plaintiff Trustees' counsel demonstrates it incurred in preparing this action;

**IT IS FURTHER ORDERED** that plaintiff Trustees' counsel make application to this Court for payment of its fees and costs within ten (10) days of the filing of this Order;

**IT IS FURTHER ORDERED** that plaintiff Trustees' motion for sanctions is denied.