**Ronald JACKSON et al.,**

v.

**EGYPTIAN NAVIGATION COMPANY.**

No. CIV.A. 99–5695.

United States District Court,
E.D. Pennsylvania.

Sept. 23, 2002.

William D. Marvin, Kessler Cohen & Roth, Steven L. Smith, Kessler Cohen & Roth, Philadelphia, PA, for plaintiff.

Gary Francis Seitz, Philadelphia, PA, for defendant.

### MEMORANDUM

BAYLSON, District Judge.

The issue presented by this case is the scope of a shipowner's duty to a stevedore injured during the course of unloading the ship's cargo. Presently before this Court is the Motion for Summary Judgment of defendant Egyptian Navigation Company ("Defendant"), the Answer to Defendant's Motion by plaintiff Ronald Jackson and his wife, Pamela Jackson ("Plaintiff" or "Jackson"), and Defendant's Supplemental Motion in Reply to Plaintiff's Answer. Oral argument was held on August 21, 2002. For the reasons which follow, Defendant's Motion will be granted.

### I. Background

The following facts are undisputed. Plaintiff, a citizen of New Jersey, was employed for many years by the Delaware River Stevedores ("DRS"), pursuant to a contract of employment made through the International Longshoremen's Association and its local offices and hiring hall in Philadelphia, Pennsylvania. On August 28, 1999, Plaintiff, a fill-in for that day, and other longshoremen were employed by DRS to discharge large coils of steel sheets from various cargo holds of the M/V Alexandria, which was berthed at the Camden Marine Terminal in Camden, New Jersey. The M/V Alexandria is owned by Defendant, a citizen of Egypt. When Plaintiff arrived aboard the ship, he was assigned to work in the lower cargo hold with the Cropper Gang, a group of stevedores who often worked on ships at the Camden Marine Terminal.

Plaintiff, a car loader by trade, did not ordinarily work aboard ships and had not worked previously with the Cropper Gang. The men working in the cargo hold included Plaintiff and three experienced longshoremen. Additionally, the gang was assigned a crane operator who worked the shore-based overhead crane and a hatch tender, who relayed signals between the men in the hold and the crane operator. There was also a gang boss who supervised the gang's work, a ship superintendent, and cargo superintendent. DRS employed everyone involved in this operation.

The cargo consisted of large coils of steel sheets, sitting on the hold's metal floor with one inch of lumber or "dunnage" between the metal floor and the coils. Dunnage was also used to brace the coils from rolling between the end coils and the sides of the ship. The coils were further secured with metal bands.

The men in the cargo hold cut the metal bands to free the coils and ran straps through the middle of the coils so that the crane could hoist them out of the ship. Since the coils were stacked several tiers high, the longshoremen were required to climb on top of the coils to do some of their work. Plaintiff assisted in the dis-

charge by threading straps through the center of the coils.

At around 11:20 a.m., the stevedore gang had completed discharging the steel coils from the top deck of the hold. After the hatch to the lower deck was opened by the ship's crew, Plaintiff used a ladder mounted to the side of the bulkhead to get from this "tween" deck, so called because it is the deck between the top and bottom cargo holds, to the lower hold to assist in discharging cargo. Plaintiff watched his fellow longshoremen descend the ladder to get to the lower hold. At the bottom of the ladder, which did not reach the floor of the deck below, a wooden plank extended from the bottom rung of the ladder to the top of the adjacent coils stacked a few feet away. When Plaintiff had descended the ladder as far as he could, he reached the plank. He assumed, since his co-workers were on top of the cargo, that they had crossed the plank to get where they were, and similarly he was to cross the plank to get there. The plank spanned a gap of three to four feet from the bottom of the ladder to the cargo. When Plaintiff reached the plank and tried to cross it, he saw the DRS ship superintendent standing at the other side of the plank, apparently waiting to cross on the plank to get to the ladder. Plaintiff stepped on the plank, and it broke under his weight, causing him to fall to the steel deck in between the cargo and the side of the ship ten feet below, which indisputably caused his injuries.

Plaintiff sued Defendant alleging that the shipowner's negligence caused his injuries.

## II. *Legal Standard and Jurisdiction*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is enti-

tled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

As the parties are citizens of different States, and the amount in controversy exceeds $75,000, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a). Since this action arises from

commercial activity carried on in the United States, Defendant is subject to jurisdiction under 28 U.S.C. § 1605(a)(2). Defendant has waived its objection to venue.

### III. *Analysis*

#### A. *Applicable Statute and Leading Cases*

Plaintiff alleges that Defendant breached one of its duties under the 1972 Amendments to the Longshoremen's and Harbor Worker's Compensation Act ("LHWCA"), 33 U.S.C. § 905(b), which provides in relevant part:

> "In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.... The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter."

Plaintiff claims the following three issues of material fact should prevent summary judgment from being granted in favor of Defendant: 1) the ship's crew had notice of the plank extending from the ship's ladder to the top of the cargo but failed to take any action; 2) when the ship's crew members opened the lower hold and turned it over to the longshoremen for unloading they could not expect the longshoremen to protect themselves from the plank extending from the ship's ladder to the top of the cargo; and 3) the defect in the plank which caused it to break was not open and obvious to the longshoremen. Pl.'s Mem. Opp. Summ. J. at 1.

■ In *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981) and *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994), the Supreme Court explained the three duties that a shipowner owes to longshoremen under the LHWCA. The first, which courts call the "turnover duty," relates to the condition of a ship upon the commencement of stevedoring operations; the second provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain in the "active control" of the shipowner; the third, called the "duty to intervene," concerns the shipowner's obligations regarding cargo operations under the principal control of the independent stevedore. *Howlett*, 512 U.S. at 98, 114 S.Ct. 2057 (citing *Scindia*, 451 U.S. at 167–78, 101 S.Ct. 1614).

The parties do not dispute that, based on the allegations of Plaintiff's Complaint, and the facts and evidence adduced, only the shipowner's turnover duty is implicated here. Def.'s Mem. Supp. Summ. J. at 6, Pl.'s Mem. Opp. Summ. J. at 6.

■ The turnover duty and its corollary may be summarized as follows:

> "A vessel must 'exercise ordinary care under the circumstances' to turn over the ship and its equipment and appliances 'in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care' to carry on cargo opera-

tions 'with reasonable safety to persons and property.' "

*Howlett,* 512 U.S. at 98, 114 S.Ct. 2057 (quoting *Federal Marine Terminals, Inc. v. Burnside Shipping Co.,* 394 U.S. 404, 416–17 n. 18, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969)).

> "A corollary to the turnover duty requires the vessel to warn the stevedore 'of any hazards on the ship or with respect to its equipment,' so long as the hazards 'are known to the vessel or should be known to it in the exercise of reasonable care,' and 'would likely be encountered by the stevedore[,] and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.' "

*Id.* at 98–99, 114 S.Ct. 2057 (quoting *Marine Terminals,* 394 U.S. at 416 n. 18, 89 S.Ct. 1144).

In *Howlett,* the Supreme Court reiterated its holding in *Scindia* recognizing the ship's limited "duty to intervene" in the event that the shipowner has no knowledge of the hazardous condition. " 'Absent contract provision, positive law, or custom to the contrary,' a vessel 'has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore.' " *Id.* at 101 (quoting *Scindia,* 451 U.S. at 172, 101 S.Ct. 1614).

The following case law discussion reflects Third Circuit decisions cited by either or both of the parties, or which the Court finds relevant.

In *Derr v. Kawasaki Kisen K.K.,* 835 F.2d 490, 491 (3d Cir.1987), two longshoremen plaintiffs, injured in separate but similar accidents in which cargo fell upon them during unloading, appealed from directed verdicts entered in favor of the respective defendant shipowners. The plaintiffs were employed by independent stevedores responsible for unloading the cargo, which had been loaded by foreign stevedores. *Id.* at 491. The plaintiffs argued that the shipowners were negligent because it was obvious that the cargo was improperly secured by the foreign stevedore. *Id.*

In affirming the district court judgments for the defendants, the *Derr* Court found that "the shipowner has no duty to supervise or inspect cargo loaded or unloaded by foreign stevedores and therefore may not be held liable for injuries arising out of a stevedore's failure to perform his job properly." *Id.* at 493. Further, the Court held that the shipowner has no duty to inspect cargo or stowage prior to turning over the vessel to the discharging stevedore. *Id.* at 494. The Court also held that the reference in *Scindia* to the shipowner's duty regarding the "ship and equipment" does not extend to the stowage or condition of the cargo:

> "We construe that language to refer to the physical work space. The [Supreme] Court could not have intended by this reference to establish a duty by the ships with respect to cargo that it had expressly negated in other portions of the opinion. Thus, there was no basis in either of these cases for the jury to have found negligence by the ship on the basis of any defective equipment or gear."

*Id.* at 495–96. The Court reasoned that there could be no liability for failing to warn the discharging stevedore of open and obvious conditions involving cargo since "the ship can be held liable for failure to warn of improper stowage, if at all, when the ship has both actual knowledge and the danger was not open and obvious." *Id.* at 496.

■ Furthermore, the Court found that the mere observation of the loading and stowage of cargo by the shipowner or its

representative "cannot be used to reimpose the general duty to supervise the stevedore with respect to the manner in which the cargo is stowed or dunnage is used. Nor can such observation be vaulted into the type of active involvement and control that would trigger a ship's liability." *Id.* at 494 (citations omitted).

In *Kirsch v. Plovidba,* 971 F.2d 1026, 1027 (3d Cir.1992), a longshoreman was injured when he slipped and fell while loading cargo aboard a ship as a result of the shipowner's alleged negligence in turning over the ship with a large oil slick in the cargo hatch. The district court entered summary judgment in favor of the defendant shipowner, and the plaintiff appealed. *Id.* at 1027. On appeal, the Court affirmed the district court's judgment, holding that "a shipowner may be negligent for failing to eliminate an obvious hazard that it could have eliminated, but only when it should have expected that an expert stevedore could not or would not avoid the hazard and conduct cargo operations reasonably safely." *Id.* at 1031.

*Kirsch* did not overrule *Derr* because that case dealt with the turnover duty as it applies to the ship's equipment and physical workspace. *Derr,* 835 F.2d at 495–96. In *Kirsch,* the plaintiff based his claim on unsafe workspace conditions because the cargo hold was empty when he slipped on the oil slick. *Id.* at 1032 n. 7.

In *Serbin v. Bora Corp. Ltd.,* 96 F.3d 66, 69 (3d Cir.1996), a case squarely addressing the active operations duty, a longshoreman was injured while attempting to move a stuck block on a hatch cover during the course of his work loading cargo. The plaintiff brought an action against the shipowner, alleging that the shipowner was negligent in failing to discover and correct the stuck block. *Id.* at 69. The defendant ship owner moved for summary judgment on the grounds that the plaintiff could not establish a breach of any duty, and the

district court granted the defendant's motion. *Id.*

On appeal, the Court reviewed the elements necessary to establish a prima facie case of breach of the active operations duty:

"(1) that the vessel appreciated, should have appreciated, or with the exercise of reasonable care would have appreciated, the condition; (2) that the vessel knew, or should have known, that the condition posed an unreasonable risk of harm to a longshore worker; (3) that a longshore worker foreseeably might fail to I) either discover the condition or apprehend the gravity and probability of the harm, or ii) protect himself or herself from the danger; and 4) that the vessel failed to take reasonable precautionary or remedial steps to prevent or eliminate the dangerous condition."

*Id.* at 71 (citing *Davis v. Portline Transportes Maritime Internacional,* 16 F.3d 532, 541 (3d Cir.1994)).

In reversing the district court's granting of summary judgment, the Court agreed with the district court's holding that it was possible to conclude that the crew had actual knowledge of the stuck block but disagreed with the district court's findings on the remaining three factors. *Id.* at 71–72.

With respect to unreasonable risk of harm, the Court found that the plaintiff need not introduce evidence about stuck blocks generally but could rely on evidence about the block at issue if a factfinder could draw a reasonable inference that the block was a general hazard. *Id.* at 73. Also, because the plaintiff must show the block presented a general hazard, he was entitled to the inferences flowing from the many ways that a stuck block could injure someone. *Id.*

■ Regarding the foreseeability of whether the longshoremen would discover and protect themselves from the harm, the Court found that under the active operations duty, obviousness is not a complete bar to liability. *Id.* at 74 (citing *Davis,* 16 F.3d at 543–45). The Court distinguished *Davis* from *Howlett,* which held that obviousness was a complete bar to recovery under the turnover duty, and the shipowner need warn only of "latent hazards in the cargo stow" known to it. *Id.* at 75 (quoting *Howlett,* 512 U.S. at 99, 114 S.Ct. 2057). "Because the vessel does not exercise the same degree of operational control over, and does not have the same access to, the cargo stow, . . . its duties with respect to the stow are limited by comparison." *Id.* (quoting *Howlett,* 512 U.S. at 105, 114 S.Ct. 2057).

Addressing the final prong of the prima facie case, the Court determined, based on the plaintiff's evidence that it was customary for longshoremen themselves to remove hazardous conditions involving blocks and hatch covers, that a factfinder could conclude that the shipowner failed to take reasonable steps to rectify the block's dangerous condition. *Id.* at 76–77.

B. *Application of Legal Principles to the Facts and Plaintiff's Contentions*

As noted above, the parties agree this case only implicates the turnover duty. At oral argument, Plaintiff's counsel, recognizing that the turnover took place several hours prior to the accident, asserted that there were two separate turnovers:

"There are, essentially two different turnovers here and two turnover duties. They turned over the upper hold first, then the upper hold was discharged, the cargo was discharged. Then, the vessel was called back in to remove the cover-the tween deck cover—to provide access to discharge the cargo in the lower hold. That is a separate turnover and I don't think there's any dispute here that there's a separate turnover duty, because that is the first time when the stevedores are given access to the lower cargo hold."

Oral Arg. Tr. at 26. However, a review of the case law and the record, including Plaintiff's expert report, discussed below, reveals no legal authority or factual basis to allow a theory of separate turnovers to go to the jury.

Turning to his three alleged genuine issues of material fact, *supra,* Plaintiff is unable to cite to any facts that would permit a judge or jury to find in his favor on these issues.

■ First, Plaintiff is unable to prove that Defendant had notice of the plank, but failed to take any action. Plaintiff testified that he did not know where the plank came from, Jackson Dep. Def.'s Ex. D at 102–03, 140, was unaware of it until he descended the ladder, *id.* at 102–03, and did not see anyone else cross the plank. *Id.* at 132–33, 140. The M/V Alexandria's first officer testified that the crew did not use a piece of wood to get from the ship's ladder to the top of the cargo in the lower hold, El Hobgy Dep. Pl.'s Ex. B at 62, nor did he notice anyone using any dunnage as a bridge to get from the ladder to the cargo. *Id.* at 48–52.

Plaintiff relies heavily on photographs in Plaintiff's Exhibit A, particularly Exhibit A1, which was also examined during oral argument. The photograph depicts a cargo hold filled with containers of large coils and a wooden plank at the far right corner leaning against a ladder. Pl.'s Ex. A1. Four men, the plaintiff and his three co-workers, are sitting on the tween deck. *Id.;* Jackson Dep. Def.'s Ex. D at 112–13. The photograph contains the date stamp "28 8 '99," but does not list the time. Pl.'s Ex. A1. When asked in his deposition, though, Plaintiff was unable to say wheth-

er the photograph depicted the plank and ladder at issue, nor was he able to remember how the plank was situated. Jackson Dep. Def.'s Ex. D. at 106–08. At oral argument, Defendant's counsel conceded that for the purposes of this Motion, the picture in Exhibit A1 depicted the ladder and plank at issue. Oral Arg. Tr. at 8. Plaintiff, however, was unable to establish that anyone other than his supervisor and three co-workers were aware of the placement of the plank before his accident. Jackson Dep. Def.'s Ex. D at 100–01, 134–35, 140.

At oral argument, Plaintiff's counsel conceded that there was no record evidence to show how the plank got in the cargo hold, saying instead that "the circumstantial evidence is, that it was there before the vessel turned over the cargo hold to the stevedoring company and that's really the crux." Oral Arg. Tr. at 23–24. Plaintiff's counsel relies almost exclusively on "this photograph and the testimony of Mr. Jackson, they didn't put it there. If the stevedores didn't put it there, then it had to be there before they got there and this photograph, indeed, shows that it was there before they got there." *Id.* at 24.

However, an examination of the photograph in Exhibit A1 does not create a genuine issue of material fact as to the shipowner's knowledge of the plank. As Defendant's counsel aptly pointed out, there is no evidence as to the exact time the photograph was taken. From Plaintiff's deposition testimony and because he is sitting on the tween deck, Jackson Dep. Def.'s Ex. D at 112–13; Pl.'s Ex. A1, the picture must have been taken at some point before Plaintiff descended into the cargo hold. The parties conceded at oral argument and the record shows that the ship was turned over at 8:00 a.m. on August 28, 1999. *Id.* at 37; Chief Officer's Log Book Def.'s Ex. C. The log book further indicates that the discharging of lower

hatch two began at 11:20 a.m. and ceased at 11:35 a.m. because "cargo man fell down between the coil and ship's side." Chief Officer's Log Book Def.'s Ex. C. That leaves a significant amount of time unaccounted for: more than three hours in the morning when the upper hold was being worked and fifteen minutes from the time the hatch to the lower hold was opened, to Plaintiff's injury. The plank could have been placed in the lower hold at any time during this extensive period and could have come from anywhere. It could have fallen from the above hold, been placed there by the supervising stevedore, who had to have been in the lower hold before Plaintiff and his co-workers, or by the marine surveyor who took the photographs. There can be no inference that Defendant placed the plank in the lower hold against the bottom rung of the ladder or had any knowledge that it was there.

There simply is no record evidence supporting Plaintiff's contention that Defendant knew that a piece of dunnage had been placed in the hold to bridge the space between the top of the cargo to the ship's ladder.

Further, Plaintiff is unable to prove that Defendant knew or should have known that the longshoremen would disregard the risk posed by the plank. Plaintiff testified that he was only aware of himself, his three co-workers, and supervisor in the hold at the time of his injury. Jackson Dep. Def.'s Ex. D at 100–01. Plaintiff did not see anyone place the plank from the ladder to the top of the cargo nor did he see anyone cross the plank. *Id.* at 140. No one from the ship's crew told him to cross the plank. *Id.* at 149. The ship's first officer testified that the crew did not use a piece of wood to get from the ship's ladder to the top of the cargo in the lower hold, El Hobgy Dep. Pl.'s Ex. B at 62, nor did he notice anyone using any dunnage as

a bridge to get from the ladder to the cargo. *Id.* at 48–52.

There simply is no record evidence supporting Plaintiff's contention that Defendant knew or should have known that the longshoremen would disregard the risk posed by the plank.

Finally, Plaintiff is unable to show issues of fact for trial that the hazard posed by the plank was not open and obvious to the longshoremen, and Defendant does not concede that it had knowledge of or should have known about the plank.[1] Plaintiff asserts that the dangerous condition which caused his injury was the weakness of the plank itself.

### C. *Plaintiff's Expert Report Does Not Create An Issue of Fact for Trial*

Plaintiff offers as evidence an unsworn expert report regarding the shipowner's duties. This unsworn report does not meet the requirements of Fed.R.Civ.P. 56(e) and "is not competent to be considered on a motion for summary judgment." *Fowle v. C & C Cola*, 868 F.2d 59, 67 (3d Cir.1989) (citing *Adickes v. S.H. Kress &*

Co., 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). However, even if the report were sworn to and/or otherwise admissible, it would not help Plaintiff because it does not create a genuine issue of material fact. The expert's opinion, that the ship had an affirmative duty to inspect the stowage in the cargo hold, amounts to a mere assertion of a legal conclusion in contravention of Supreme Court precedent and the LHWCA, and as noted above, the expert's report says nothing about two separate turnovers, as Plaintiff contends.

There simply is no record evidence supporting Plaintiff's contention that the hazard posed by the plank was not open and obvious to the longshoremen.

### IV. *Conclusion*

Plaintiff has produced no evidence from which a jury could reasonably conclude that Defendant breached any duty owed to Plaintiff. For the reasons stated above, Defendant's Motion for Summary Judgment will be granted and judgment entered in favor of Defendant.

An appropriate Order follows.

---

1. Defendant has made other arguments which the Court does not find determinative in deciding to grant summary judgment in favor of Defendant. Defendant contends that DRS, not the shipowner, violated numerous Occupational Safety & Health Administration ("OSHA") regulations by allowing the longshoremen to use the plank as a walkway. *See* 29 C.F.R. §§ 1918.21, 1918.24, 1918.25, 1918.32(b), 1918.33(a). The obligations imposed by OSHA on the stevedore may not be extended to the shipowner. *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 170, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981); *Derr v. Kawasaki Kisen K.K.*, 835 F.2d 490, 493 (3d Cir.1987). Defendant asserts that ship liability is not implicated when a stevedore's employee watches as a longshoreman crosses a piece of dunnage extending from the ship's ladder to the top of the cargo ten feet above the deck. Def.'s Supplemental Mem. Supp. Summ. J.at 11.

In support of Defendant's lack of knowledge of a dangerous condition, Defendant asserts that the dunnage at issue (the plank which broke) was not part of the ship's equipment or gear. The first officer testified that the dunnage at issue was provided by the shipper of the steel cargo and not the shipowner for the purpose of segregating and securing the cargo in the lower hold. El Hobgy Dep. Pl.'s Ex. B at 21, 47–50. The stevedores removed the dunnage as they worked to unload the cargo and eventually discharged the dunnage from the ship. *Id.* at 40–41. The shipowner need only warn of "latent hazards in the cargo stow" known to it. *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 99, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994). "Because the vessel does not exercise the same degree of operational control over, and does not have the same access to, the cargo stow ..." the scope of the turnover duty is narrow here. *Id.* at 105, 114 S.Ct. 2057.

### ORDER

AND NOW, this 23rd day of September, 2002, upon consideration of Defendant's Motion for Summary Judgment, Plaintiff's Answer, and Defendant's Supplemental Motion in Reply to Plaintiff's Answer, it is hereby

ORDERED that Defendant's Motion for Summary Judgment is GRANTED and Judgment is entered in favor of Defendant and against Plaintiff.