

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-7-2004

# Jackson v. Egyptian Navigation

Precedential or Non-Precedential: Precedential

Docket No. 02-3828

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Jackson v. Egyptian Navigation" (2004). *2004 Decisions.* Paper 753.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/753

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT
_____

02-3828
_____

RONALD JACKSON and
PAMELA JACKSON, h/w,

Appellants

v.

EGYPTIAN NAVIGATION COMPANY,

Appellee

_____

Appeal from an Order
Of the United States District Court
For the Eastern District of Pennsylvania
(E.D. Pa. No. 99-5695),
Dismissing Plaintiff's Complaint on
Defendant's Motion for Summary
Judgment
District Judge: Hon. Michael M. Baylson

_____

Argued December 2, 2003

Before: SLOVITER, ALITO and
FRIEDMAN,[*] Circuit Judges

(Filed: April 7, 2004)

_____

*       Daniel M. Friedman, United
States Senior Circuit Judge for the
Federal Circuit, sitting by designation.

Stewart L. Cohen
William D. Marvin     (Argued)
Steven L. Smith
Kessler Cohen & Roth
Philadelphia, PA  19102

Attorneys for Appellants

Richard Q. Whelan  (Argued)
Gary Francis Seitz
Palmer, Biezup & Henderson
Philadelphia, PA  19106

Attorneys for Appellee

OPINION OF THE COURT

FRIEDMAN, Circuit Judge.

In this case a longshoreman employed by a stevedoring company seeks to recover under the Longshore and Harbor Workers' Compensation Act, ("Longshore Act"), 33 U.S.C. §§ 901-950 (2000), from the shipowner for injuries he suffered while unloading the ship. The longshoreman's theory is that the shipowner was negligent because it failed to provide him with a safe place to work. The district court dismissed the complaint, and we affirm.

I

A. The appellant Ronald Jackson ("Jackson") was employed as a longshoreman by Delaware River Stevedores. He was injured while unloading a cargo of steel coils from a ship owned by the appellee Egyptian Navigation Company ("Egyptian") (an Egyptian corporation) that had arrived in Camden, New Jersey the previous day.

The cargo had been loaded in Turkey by a different stevedoring company.

The ship contained two holds, one above the other. The unloading of the top hold began at 8 a.m. and was completed at 11 a.m. The ship's crew members then opened the cover of the lower hold, and the longshoremen climbed into that hold to start unloading the cargo stored there.

Jackson was the fifth person to descend into the lower hold. The first man down was a superintendent from the stevedoring company; he was followed by three other longshoremen.

As Jackson descended a ladder on the side of the lower hold, he saw the four others standing on top of the coils about ten feet above the floor of the hold. Upon going down the ladder, he saw a narrow piece of wood extending from one of the rungs of the ladder (which was about ten feet above the floor of the hold) across an open space of approximately four or five feet to the top of the coils. Apparently believing that the other men had walked across the board to reach the cargo, Jackson started to walk over the board. The board broke; Jackson fell ten feet to the floor of the hold and was seriously injured.

It turned out that the board was made of dunnage, a cheap and weak form of wood that stevedores regularly use in connection with stowing cargo to fill in empty spaces and thus reduce or eliminate movement by the cargo during the voyage. The parties agree that the Turkish stevedore had supplied and placed dunnage in the lower hold. The stowed cargo sat upon dunnage that was between it and the floor of the hold; there was also dunnage placed between the various coils to prevent their movement.

There was no direct evidence on how or when the board had been placed between the ladder rung and the stowed cargo. The ship's First Officer indicated in his deposition that in his daily inspections of the cargo area during the voyage, he never noticed any plank in that position. Jackson's theory is that the board was placed in that position by the Turkish stevedore when it loaded the cargo in Turkey and that it remained there during the ship's transatlantic voyage.

B. Jackson and his wife then filed the present damages action in the United States District Court for the Eastern District of Pennsylvania against Egyptian. The complaint alleged that Jackson's fall "was caused by the sudden failure of the means provided by defendant to walk from an access ladder permanently affixed to the vessel, to the top of the cargo, approximately ten feet above the floor of the hold"; that Jackson "had been directed to use this ladder and means of access by the crew of the defendant's vessel, in order to reach the cargo in the lower hold"; and that "[t]he conditions which caused plaintiff's injuries were created by defendant no later than when the cargo was loaded overseas, and defendant allowed those conditions to remain for the entire length of the voyage." The complaint further alleged that the defendant "knew or should have known" that "the conditions in the hold and the means for access to the cargo were improper, defective, inadequate, dangerous, and unsuitable," that the "plaintiff and the other stevedores would be required to use these means for access, because there was no other way

2

for them to reach the cargo to prepare it for unloading," and that "because of the conditions in the hold, including the physical arrangement of the ladder and cargo access, and the poor lighting conditions, the plaintiff and other stevedores would not be able to discover the danger or protect themselves from it." Finally, the complaint stated:

> Defendant's acts and omissions as set forth above, by its agents, servants and employees, were careless and negligent, making defendant liable to plaintiffs under general maritime law and the laws of the jurisdiction where the injury occurred.

After some discovery, the district court granted Egyptian's motion for summary judgment and dismissed the complaint. Jackson v. Egyptian Navigation Co., 222 F.Supp. 2d 700 (E.D. Pa. 2002). After discussing relevant decisions of the Supreme Court and this court, the district court pointed out that "[t]he parties do not dispute that, based on the allegations of Plaintiff's Complaint, and the facts and evidence adduced, only the shipowner's turnover duty is implicated here," id. at 704, i.e., the duty to turn over to the stevedore a safe place to work and "to warn of known, nonobvious hazards," Serbin v. Bora Corp., 96 F.3d 66, 70 (3d Cir. 1996) (quoting Kirsch v. Plovidba, 971 F.2d 1026, 1028 (3d Cir. 1992)). The court held that the "Plaintiff has produced no evidence from which a jury could reasonably conclude that Defendant breached any duty owed to Plaintiff."

Jackson, 222 F.Supp. 2d at 709.

The court ruled that Jackson was "unable to prove" that the "Defendant had notice of the plank, but failed to take any action," id. at 707, that the "Defendant knew or should have known that the longshoremen would disregard the risk posed by the plank," id. at 708, or that "the hazard posed by the plank was not open and obvious to the longshoremen," id. at 709. It therefore concluded that the three factual disputes that Jackson contended precluded summary judgment did not present any "genuine issues of material fact." Id. at 707.

II

A. Prior to 1972, a longshoreman injured while working aboard a ship could recover from the ship under the Longshore Act without proving negligence, pursuant to the unseaworthiness doctrine that made the ship absolutely liable for such injuries. See Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 164-65, 172 (1981). In 1972, however, Congress significantly changed the basis of the shipowner's liability. It eliminated liability based on unseaworthiness and provided that "[i]n the event of injury to a person covered under [the Longshore Act] caused by the negligence of a vessel, then such person . . . may bring an action against such vessel." 33 U.S.C. § 905(b). "Section 905 (b) did not specify the acts or omissions of the vessel that would constitute negligence." Scindia, 451 U.S. at 165. In Scindia and Howlett v. Birkdale Shipping Co., 512 U.S. 92 (1994), the Supreme Court explained the scope and parameters of the ship's duty to the longshoremen working on it for a

3

stevedoring company.

In Howlett, the Court stated that Scindia had "outlined the three general duties shipowners owe to longshoremen. The first, which courts have come to call the 'turnover duty,' relates to the condition of the ship upon the commencement of stevedoring operations." Id. at 98. As we have noted, the present case, like Howlett, involves only the ship's "turnover duty."

Under that duty [a] vessel must "exercise ordinary care under the circumstances" to turn over the ship and its equipment and appliances "in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care" to carry on cargo operations "with reasonable safety to persons and property." A corollary to the turnover duty requires the vessel to warn the stevedore "of any hazards on the ship or with respect to its equipment," so long as the hazards "are known to the vessel or should be known to it in the exercise of reasonable care," and "would likely be encountered by the stevedore in the course of his cargo operations[,] are

not known by the stevedore[,] and would not be obvious to or anticipated by him if reasonably competent in the performance of his work."

Id. at 98-99 (internal citations omitted).

The Court in Howlett also pointed out that "there can be no recovery under [§ 905(b)] for a vessel's failure to warn of dangers that would be apparent to a longshoreman of reasonable competence." Id. at 104. "[T]he vessel's turnover duty to warn of latent defects in the cargo stow and cargo area is a narrow one. The duty attaches only to latent hazards, defined as hazards that are not known to the stevedore and that would be neither obvious to nor anticipated by a skilled stevedore in the competent performance of its work." Id. at 105.

This court has recognized the obviousness limitation on the ship's duty to warn. In Serbin, this court stated that in Howlett the Supreme Court held in a turnover duty case that if "the hazard . . . was obvious to a competent stevedore, summary judgment would be appropriate for the ship," and that this court "had already decided that obviousness was a bar to liability under the turnover duty." 96 F.3d at 75.

B. Jackson contends that the ship violated its turnover duty because it knew of the board's location in the lower hold and because the presence of the board was not an obvious danger that the stevedore should have immediately ameliorated but was a concealed defect of which the ship was required to warn the stevedore. The district court correctly

4

ruled that under the governing principles discussed above, Jackson had not shown that Egyptian violated its turnover duty and that Jackson's contentions did not raise any disputed issues of material fact that precluded summary judgment. 96 F.3d at 75.

Even if one were to assume, contrary to the district court's ruling and the evidence in the record, that the board was placed in that position by the Turkish stevedore, remained there during the entire voyage, and that the ship was aware of its presence there, Jackson still could not prevail. The ship has no duty to warn about an obvious hazard in the work area that a competent stevedore would be expected to discover while properly performing its duties. There is no claim that the stevedore here was not competent. The presence of the board was an obvious hazard, and the stevedore's superintendent, who was the first employee to descend into the lower hold in connection with the cargo removal, should either have removed the board or warned the longshoremen not to use it in moving from the ladder to the cargo.

The ship's First Officer explained the danger the board presented to the safety of the longshoremen:

> [I]t's very easy for somebody to slip on a 10 centimeter-wide piece of wood. And . . . usually, the laborer will never go on top of that because it's [not safe], and he doesn't jump because jumping is against stability and he could still lose his stability and fall down. . . . [W]hether he

was overweight or underweight, it doesn't make a difference. Stability rules have to be followed all the way through.

Under the foregoing analysis, it is irrelevant that Jackson's injury resulted not from his slipping and falling off the board but from the board breaking while he was walking across it. The obvious hazard the board created for the longshoremen was that it would be dangerous for them to use as a bridge between the ladder and the cargo – not because it was inferior wood that was likely to break but because it was so narrow and unprotected that there was a serious danger that anyone who used it might slip and fall off it. Although use of the board was more hazardous because the board itself was internally weak, the nature of the hazard the board posed was not changed by the nature of the injury Jackson suffered.

Jackson argues that even if the board posed an obvious danger, this case comes within this court's ruling in Kirsch that the ship may be liable for injuries caused by obvious dangers "if the shipowner should have expected that the stevedore and its longshore workers could not or would not avoid the danger." 971 F.2d at 1026. In rejecting this contention, the district court ruled that there was "no record evidence supporting [Jackson's] contention that [Egyptian] knew or should have known that the longshoremen would disregard the risk posed by the plank." Jackson, 222 F.Supp. 2d at 709. For example, the First Officer stated that no member of the ship's crew used the board to reach the cargo and that he did not see anyone

using the board as a bridge.

This court has stated that questions relating to the existence and obviousness of hazards in the cargo area "generally" are not to be decided on summary judgment but require a trial. Serbin, 96 F.3d at 73; Kirsch, 971 F.2d at 1030. This case, however, comes within the exception to that principle. Here the evidence is unequivocal that the board's presence and placement presented an obvious danger and hazard to the safety of a longshoreman unloading the cargo, which the stevedore should and could have corrected and for which the shipowner was not liable. See Serbin, 96 F.3d at 75. There is no evidence from which a reasonable jury could have concluded otherwise.

In view of our conclusion on that issue, we need not consider Jackson's contentions that the board was in its position in the lower hold before anyone descended to that area to unload it and that the ship knew of its presence.

The order of the district court granting the defendant's motion for summary judgment is affirmed.