**Gary PRINSKI and Louise Prinski, Plaintiffs,**

v.

**BLUE STAR LINE MARINE LTD., Defendant.**

**No. 02–CV–7981.**

United States District Court, E.D. Pennsylvania.

Oct. 20, 2004.

the immediately preceding testimony provided by Dr. Chowhan that is noted above.

E. Alfred Smith, Alfred Smith & Associates, Philadelphia, PA, for Plaintiffs.

Carl D. Buchholz, III, Rawle & Henderson LLP, Philadelphia, PA, for Defendant.

### MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

Plaintiffs Gary Prinski and Louise Prinksi, husband and wife, bring this claim under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 905(b) (2001), for personal injuries sustained by Gary Prinski ("Prinksi") while working as a longshoreman aboard the Merchant Vessel America Star on February 24, 2001. Defendant Blue Star Line Marine Ltd. ("Blue Star Line") is the owner of the Merchant Vessel America Star. Blue Star Line has filed a motion for summary judgment.

### I. FACTS

The following facts are undisputed. Prinski was employed by Holt Cargo Systems, Inc. as a longshoreman. (Am. Compl. ¶ 7, Def.'s Mot. Summ. J. ¶ 2.) On February 24, 2001, Prinski was working on board the Merchant Vessel America Star, which was moored in the Port of Philadelphia, Pennsylvania. (Am. Compl. ¶¶ 6, 8, Def.'s Mot. Summ. J. ¶ 2.) Prinski and his fellow employees were carrying container locks from storage bins on the main deck to the area where the container locks would be loaded. (Am. Compl. ¶ 8, Def.'s Mot. Summ. J. ¶ 4.) In order to walk up and down the main deck, Prinski and other employees had to walk under a number of archways that were part of a container support platform or superstructure that made it possible to store containers above the main deck.[1] (Am. Compl. ¶ 8, Def.'s Mot. Summ. J. ¶ 5.) The archways varied in height. (Am. Compl. ¶ 8, Def.'s Mot. Summ. J. ¶ 9.)[2]

The following facts are presented in the light most favorable to the plaintiffs. Prinski is six feet, six inches when wearing a hard hat and work boots. (Pls.' Mem. Opp'n Summ. J. Ex. 7.)[3] In order to walk through the archways Prinski had to duck. (Dep. Prinski at 45.) When Prinski walked through one of the archways, he lowered his head to duck under the archway, but he hit his head on the second half of the archway. (Dep. Prinski at 46.) When he hit his head he sustained injuries. (Am. Compl. ¶ 10, Dep. Prinski at 51.)

The archway on which Prinski hit his head was the lowest of the archways on the ship at seventy-two and a quarter inches high. (Pls.' Mem. Opp'n Summ. J. Ex. 6.) The arches on either side of that archway were seventy-three and a quarter inches and seventy-four and a half inches. (Id.) At oral argument, plaintiffs stated that ribs in the center of that archway were lower than the outside of the archway and plaintiffs presented a photograph with a finger pointing to a rib within the

---

1. Stephen R. Pridmore, the captain of the America Star, states that the archways are part of the general structure of the ship. (Dep. Pridmore at 32.)

2. See also testimony by Prinski's coworker, Gerald LaFrance: "if you think you cleared that one, the next one you might not because it is lower." (Dep. LaFrance at 39.)

3. Plaintiff's appendix to their memorandum opposing defendant's motion for summary judgment includes a photograph of Prinski from the shoulders up. In that picture he is wearing his hard hat. That picture includes a measuring tape indicating that the top of Prinski's hard hat is 6 feet, six inches from the floor.

archway to demonstrate that fact.[4] The archway was not painted a different color or otherwise marked to call attention to its low height. (Dep. Pridmore at 34.) The configuration of the part of the vessel that included the archways was unchanged from 1970 to 2003. (Dep. Pridmore at 23–24.)

One of Prinski's co-workers testified that he had struck his head on these low archways even though he knew that the archways were low on the America Star (Dep. LaFrance at 32, 36),[5] and that he complained to the crew of the America Star about the height of the archways. (Dep. LaFrance at 32,34.) In addition, the ship's captain admitted to bumping his hard hat on the archways at times (Dep. Pridmore at 26–27).[6]

## II.  LEGAL STANDARD

Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  There is a "genuine"

issue if the evidence would permit a reasonable jury to find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party must make an initial showing that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The non-movant must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548, *cited in Davis v. Portline Transportes Maritime Internacional*, 16 F.3d 532, 536 n. 3 (1994).  In determining whether the non-moving party established each element of its case, the court must draw all reasonable inferences in the non-moving party's favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

This court has jurisdiction pursuant to 28 U.S.C. § 1331, because the claim arises under federal law, and also pursuant to 28 U.S.C. § 1332, because the parties are di-

---

**4.**  For purposes of summary judgment, the parties agreed in a telephone conference on October 18, 2004 that Prinski would testify that the above-referenced photograph, photograph number 3 presented at oral argument, is a photograph of the archway at issue in this case.

**5.**  He further testified as follows:

[Y]ou think you can bend your head low enough, but when you hit it, you find out you didn't. . . .  It's like a step.  You get adjusted to the height, but you're really not because the next one is lower.  There's no way once you bend your head to tell if that one is lower, you just kind of bend your head. . . .  [I've] struck the top of my head several times. . . .  At times you do forget because like I say you're getting rushed to get the job done and you're concentrating

on what you're doing for the job, like get the plugs or get the lashing bars, and your rushing.  And you may bend your head, but you're not adjusted low enough, especially with a hardhat because you're not even—it's something new to us because we're being forced to wear these hardhats which, you know, that throws our height off . . . .  you cleared the first one with your head at a certain angle, then you think you're going to clear the second one and you find out that's not so because it doesn't indicate that it's lower.

(Dep. LaFrance at 40–44).

**6.**  Although the ship's captain did not say that the archways were dangerous, an attorney asked, "But it certainly would have been safer if you didn't have to stoop; isn't that correct?" and the captain responded, "Ideally, yes." (*Id.* at 29.)

verse and the amount in controversy exceeds $75,000.

## III. DISCUSSION

The LHWCA sets forth the duties that employers owe to longshore workers. Before it was amended in 1972, the LHWCA allowed injured longshoremen to "receive compensation payments and also have judgment against the shipowner if the injury was caused by the ship's unseaworthiness or negligence," and proof of "unseaworthiness" did not require proof of fault beyond proving the existence of an unsafe condition on the vessel. *Scindia Steam Navigation Co., Ltd. v. De Los Santos,* 451 U.S. 156, 164, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). The 1972 amendments, which added section 905(b), "radically changed this scheme of things" by increasing the stevedore's [7] obligation to provide compensation payments to injured longshoremen and limiting the longshoreman's right to recover from the vessel owner. *Id.* at 165, 101 S.Ct. 1614. The amended LHWCA increases the stevedore's obligation by establishing "a comprehensive federal workers' compensation program that provides longshoremen and their families with medical, disability, and survivor benefits for work-related injuries and death." *Howlett v. Birkdale Shipping Co.,* 512 U.S. 92, 96, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994) (citations omitted). The amended LHWCA limits the vessel owner's liability to liability for negligence in Section 905(b), providing in relevant part:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such a person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party ... and the employer shall

not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.

33 U.S.C. § 905(b).

The Supreme Court interpreted "negligence" in the amended LHWCA as the violation of one of three general duties that vessel owners owed to longshoremen: (1) the "turnover duty," which concerns the condition of the ship when stevedoring operations begin and includes a duty to warn, (2) the active operations duty, which applies to areas that remain under the "active control of the vessel" and (3) the "duty to intervene," which applies in certain circumstances to cargo operations in areas that are principally controlled by the stevedore. *Howlett v. Birkdale Shipping Co.,* 512 U.S. 92, 98, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994). Neither party in the present matter contends that the intervention duty applies, so in deciding defendant's motion for summary judgment, I will address the turnover duty, the duty to warn included within the turnover duty, and the active operations duty.

### A. The Turnover Duty

■ The Supreme Court articulated the turnover duty as follows:

> A vessel must "exercise ordinary care under the circumstances" to turn over the ship and its equipment and appliances "in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care" to carry on cargo operations "with reasonable safety to persons and property."

---

7. The term "stevedore" in this opinion refers to the employer of the longshore workers. The stevedore is in charge of loading or unloading the cargo of a ship. The longshore workers are the dock workers employed by the stevedore.

*Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 98, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994) (citations omitted). Defendant argues that the applicable duty in this matter is the turnover duty and that there has been no breach of that duty. The defect in question in this case, the structure of the archways, is a part of the ship not "its equipment and appliances."

■ The Supreme Court has held that "[f]or the purposes of delineating the scope of a shipowner's turnover duty ... the cargo stow is separate and distinct from other aspects of the ship." *Id.* at 104, 114 S.Ct. 2057. It explains that vessel's obligation under the turnover duty is "commensurate with its access and control," and that, therefore, the obligation to inspect the cargo stow is more limited than the obligation to inspect the ship itself. *Id.* at 104–05, 114 S.Ct. 2057. Therefore, while the vessel owner's duty as to the cargo area is limited to latent defects, the vessel owner has a general "duty of reasonable care and a duty to warn as to the ship and its equipment." *Hill v. NSB Niederelbe Schiffahrtsges MBH & Co.*, No. Civ. A. 02–2713, 2003 WL 23162396, at *4, 2003 U.S. Dist. LEXIS 23723, at *10 (E.D.Pa. Dec. 30, 2003). Unlike cases where the alleged defect was found in the cargo stow or cargo area,[8] this case involves the general structure of the ship. (Dep. Pridmore at 32.) Therefore, the general duty of reasonable care under the turnover duty applies, rather than the more limited duty related to the cargo area.

■ Vessel owners fulfill their duty as to turning over the structure of the ship when they exercise "ordinary care under the circumstances," to turn over the vessel in a good enough condition that "an expert and experienced stevedoring contractor" who is aware of reasonably expected dangers can carry on cargo operations with "reasonable safety" by using ordinary care. *Howlett*, 512 U.S. at 98–99, 114 S.Ct. 2057.

### 1. Ordinary Care as to the Vessel's Condition: Inspecting for Hazards

■ The Third Circuit concluded that the Supreme Court decision in *Scindia* "does not cast any doubt on the shipowner's duty to inspect the ship for hazards before turning the ship over to the stevedore, because inspection is integral to providing the stevedore with a reasonably safe workplace, a duty that Scindia explicitly recognized." *Kirsch v. Plovidba*, 971 F.2d 1026, 1029 (3d Cir.1992). To determine whether a shipowner satisfied this duty, the court must determine whether there was a hazard or dangerous condition that the vessel owner had a duty to address in inspecting the vessel.

In *Serbin v. Bora Corp., Ltd.*, 96 F.3d 66, 72 (3d Cir.1996), the Third Circuit reviewed the trial court's grant of summary judgment in a case where a longshore worker was injured by a stuck block that

**8.** *Hill v. NSB Niederelbe Schiffahrtsges MBH & Co.*, 2003 WL 23162396, at *4, 2003 U.S. Dist. LEXIS 23723, at *10–11, describes the following cases that involve the cargo stow or area:

[A] coil that was part of the stowage being unloaded was part of the cargo operations. *Derr*, 835 F.2d at 496. In addition, plastic provided by the ship and laid under the cargo was stowage, but may have supported a finding of the shipowner's knowledge, thus triggering the duty to warn of latent

defects. *Howlett*, 512 U.S. at 105–6, 114 S.Ct. 2057. An oil slick of unknown origin in the cargo hatch was within cargo operations and not latent. *Kirsch v. Plovidba*, 971 F.2d 1026, 1033 (3d Cir.1992). Electrical cords attached to storage containers that had been improperly tied by the ship's crew are part of the cargo, but could be latent hazards. *Mankus v. Swan Reefer I*, 2003 U.S. Dist. LEXIS 10263, *16–17 (E.D.Pa.2003).

was attached to a hatch in the cargo hold. The court analyzed "whether a reasonable fact-finder could draw the inference that the condition posed an unreasonable risk of harm." The court stated that the plaintiff, who was the non-movant, was "entitled to the inferences flowing from the many (i.e., general) ways a stuck block could injure someone." *Id.* (citations omitted). The court then listed several ways that the stuck block could have injured someone and concluded that "recognizing that the stuck block presented a general hazard would not require clairvoyance on the part of the crew that a longshoreman would hurt himself in this particular way. A fact-finder could reasonably conclude that the crew should have recognized the general danger the stuck block posed." *Id.* at 73.

■ In the present case, the question is whether the height of the archways could be considered a dangerous condition or hazard such that the vessel owner would have a duty to address it before turning the vessel over to the stevedore. According to Blue Star Line, the archways are a part of the general structure of the ship and are not a hazard or a defect. Blue Star Line contends that minor height variations in the archways do not create a dangerous condition. Plaintiffs do not argue that the height of the archways violated any known U.S. Coast Guard or federal regulations. Plaintiffs do, however, point to testimony by a longshoreman saying that he had struck his head on these low archways (Dep. LaFrance at 32), and testimony by the ship's captain admitting to bumping his hard hat on the archway at times (Dep. Pridmore at 26–27). Although

the ship's captain did not say that the archways were dangerous, an attorney asked, "But it certainly would have been safer if you didn't have to stoop; isn't that correct?" and the captain responded, "Ideally, yes." (*Id.* at 29.) Furthermore, the plaintiffs present evidence that archways vary in height (Dep. LaFrance at 39–40), and that the archway itself had ribs that extended lower than the front of the archway.[9] Granting all reasonable inferences in favor of the non-moving party, *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348, I agree that a fact-finder could reasonably conclude that the inconsistent heights among the archways and within the structure of the archway created a dangerous condition. A fact-finder could reasonably conclude that Blue Star Line should have inspected the ship for hazards such as this one in its exercise of reasonable care, and that because it failed to discover or address this hazard, it turned over the ship in a dangerous condition.

*2. Expert and Experienced Stevedoring Contractor Operating with Reasonable Safety: Avoiding Obvious Hazards*

■■ While the shipowner has to look for hazards, the shipowner "will not ordinarily be liable to a longshore worker injured by an obvious hazard because the shipowner's duty is only to provide a workplace where skilled longshore workers can operate safely." *Kirsch*, 971 F.2d at 1029. Shipowners can "ordinarily, reasonably rely on the stevedore (and its longshore employees) to notice obvious hazards and to take steps consistent with its expertise to avoid those hazards where practical to do so." *Id.* at 1030. In most cases, the question of obviousness is a question of

---

9. Plaintiffs presented a photograph at oral argument that depicted the archway in question and the ribs within the archway, which extend below the outside of the archway. For purposes of summary judgment, the parties agreed in a telephone conference on October

18, 2004 that Prinski would testify that the above-referenced photograph, photograph number 3 presented at oral argument, is a photograph of the archway at issue in this case.

fact for the jury and not appropriate for resolution of the court on summary judgment. *Serbin*, 96 F.3d at 73. In *Kirsch* the Third Circuit concluded that there was no question for the jury in that case, because the plaintiff "candidly admit[ted] that the oil slick on the floor of the hold was obvious to all," and, therefore, there was no question of fact as to the obviousness of the hazard. *Kirsch*, 971 F.2d at 1033. In *Davis v. Portline Transportes Maritime Internacional*, 16 F.3d 532, 538 (3d Cir.1994), however, the Third Circuit reversed the district court's finding that the hazard in that case, a grease spot, was obvious, because a court must take the plaintiff's testimony as true and "resolve all inferences in his favor." In that case, while the plaintiff had seen and avoided other grease spots, the court had to conclude for purposes of summary judgment that the plaintiff was unaware of the spot that he fell on until he fell. *Davis*, 16 F.3d at 539.

■■■ Furthermore, even if a hazard is obvious, shipholders may remain liable. *Kirsch*, 971 F.2d at 1030, 1033. In *Kirsch*, the fact that the hazard was obvious satisfied only the first step of the analysis. *Id.* A shipowner may be liable for an obvious hazard if the hazard is "practically unavoidable" or if alternatives to confronting the hazard are "impractical." *Id.* at 1030. Furthermore, "positive law, custom, and contract may supplement a shipowner's duties to longshore workers. If, for example, a regulation required shipowners and only shipowners to rectify a specific type of obvious hazard, a shipowner may not reasonably expect a stevedore and its employees to do so." *Id.* at 1031. The Third Circuit concludes that "a shipowner may be negligent for failing to eliminate an obvious hazard that it could have eliminated, but only when it should have expected that an expert stevedore could not or would not avoid the hazard and conduct cargo operations reasonably safely." *Id.*

■■■ Blue Star Line in the present case argues that the height of the archways was obvious. Blue Star Line cites deposition testimony by Prinski and other longshoremen stating that they knew they had to duck to pass under the archways. Reading the facts in the light most favorable to the plaintiffs, however, the hazard is a less obvious one: the hazard posed by the varying heights of the archways and the ribs within the archway. One longshore worker testified that the heights of the archways are all different, "[s]o if you think you cleared that one, the next one you might not because it is lower." (Dep. LaFrance at 39). He continued his testimony about the hidden nature of the hazard:

you think you can bend your head low enough, but when you hit it, you find out you didn't. . . . It's like a step. You get adjusted to the height, but you're really not because the next one is lower. There's no way once you bend your head to tell if that one is lower, you just kind of bend your head. . . . [I've] struck the top of my head several times. . . . At times you do forget because like I say you're getting rushed to get the job done and you're concentrating on what you're doing for the job, like get the plugs or get the lashing bars, and you're rushing. And you may bend your head, but you're not adjusted low enough, especially with a hardhat because you're not even—it's something new to us because we're being forced to wear these hardhats which, you know, that throws our height off . . . . you cleared the first one with your head at a certain angle, then you think you're going to clear the second one and you find out that's not so because it doesn't indicate that it's lower.

(*Id.* at 40–44). There is a genuine issue as to whether the hazard is obvious, and,

therefore, Blue Star Line's liability is not precluded for purposes of summary judgment. Even if the hazard of the height variation was obvious, there would still be a genuine issue as to Blue Star Line's liability because the longshore workers could not avoid passing through the archways in carrying out their duties.[10]

## B. The Duty to Warn

Although courts sometimes combine their analysis of the turnover duty and the duty to warn, the duty to warn is a lesser included duty within the turnover duty. If the vessel owner fails to warn the stevedore of hazards that the stevedore will not recognize or anticipate, then the vessel owner is necessarily violating the turnover duty by failing to exercise ordinary care to turnover the ship in a condition that is safe to an experienced stevedore. The Supreme Court has even referred to the duty to warn as the "vessel's turnover duty to warn." *Howlett*, 512 U.S. at 105, 114 S.Ct. 2057. The vessel owner can violate the turnover duty, however, without violating the duty to warn. *Kirsch*, 971 F.2d at 1029 (finding that the duty to warn was not relevant in that case and the only issue before the court was whether the vessel owner breached "its basic duty to provide safe working conditions by turning over a ship with an obvious hazard"). In the present case, the facts do not lead inevitably to the same result in the analysis of the turnover duty and the duty to warn. Therefore, I am addressing the duty to warn separately.

Within its duty to turnover the vessel in a reasonably safe condition, the vessel owner has a duty to warn the stevedore of some hazards that are known or should be known to the owner in the exercise of reasonable care. *Howlett*, 512 U.S. at 99–99, 114 S.Ct. 2057. The duty to warn within the turnover duty applies to the following hazards:

"any hazards on the ship or with respect to its equipment," so long as the hazards "are known to the vessel or should be known to it in the exercise of reasonable care," and "would likely be encountered by the stevedore in the course of his cargo operations[,] are not known by the stevedore[,] and would not be obvious to or anticipated by him if reasonably competent in the performance of his work."

*Howlett*, 512 U.S. at 98–99, 114 S.Ct. 2057 (citations omitted). In analyzing the general turnover duty, I addressed the existence of a hazard and concluded that there was a genuine issue as to hazard that could reach the jury. In addition, it is undisputed that Prinski and other employees were likely to encounter the hazard because they had to walk under the archways to carry out their cargo operations. (Am. Compl. ¶ 8, Def.'s Mot. Summ. J. ¶ 5.) The remaining components of the duty to warn include the vessel owner's knowledge or constructive knowledge of the hazard, the reasonably competent stevedore's lack of knowledge of the hazard, and the reasonably competent stevedore's inability to recognize or anticipate the hazard. Neither plaintiffs nor defendant argues that anyone had actual knowledge that the archways varied in height. (Pls.' Mem. Opp'n Summ. J. at 8, Def.'s Reply Br. Summ. J. at 3.) The parties do dispute, however, the

---

10. The longshore workers could wear hard hats, which they did, and could duck, which they did, but there was no way for them to remedy the danger of the height variations or to avoid the archways altogether. *Cf. Jackson v. Egyptian Navigation Co.*, 364 F.3d 113, 117 (3d Cir.2004) (holding that summary judgment was appropriate because the hazard was obvious and "the stevedore's superintendent, who was the first employee to descend into the lower hold in connection with the cargo removal, should either have removed the board or warned the longshoremen not to use it in moving from the ladder to the cargo.")

vessel owner's constructive knowledge and the stevedore's inability to recognize or anticipate the hazard.

This presents the legal question of whether a hazard can exist such that a vessel owner should know of it and competent stevedores would be unable to recognize or anticipate it. This issue has not been resolved with respect to hazards in the ship or its equipment. With respect to hazards in the cargo stow of a ship, the Supreme Court said that "any dangers arising from an improper stow would be 'at least as apparent to the [stevedore] as to the [shipowner].'" *Howlett*, 512 U.S. at 104, 114 S.Ct. 2057 (citation omitted). As discussed above, however, this standard does not apply to hazards that are part of the ship itself or its equipment:

> For purposes of delineating the scope of a shipowner's turnover duty, then, the cargo stow is separate and distinct from other aspects of the ship. When be-

tween ports, the vessel and its crew have direct access to (and control over) the ship itself and its gear, equipment, and tools. The vessel's responsibilities to inspect these areas of the ship are commensurate with its access and control, bearing in mind, of course, that negligence, rather than unseaworthiness, is the controlling standard where longshoremen are concerned. Because the vessel does not exercise the same degree of operational control over, and does not have the same access to, the cargo stow, its duties with respect to the stow are limited by comparison.

*Howlett*, 512 U.S. at 104–05, 114 S.Ct. 2057. Therefore, because of stevedores' relative inexperience related to defects outside of the cargo stow, there may be hazards involving the vessel or its equipment that stevedores cannot recognize or anticipate even though a shipowner should know about or discover the hazard.[11] This

---

**11.** Defendant argues that the Fifth Circuit's reasoning in *Morris v. Compagnie Maritime Des Chargeurs Reunis*, 832 F.2d 67, 69–70 (5th Cir.1987), precludes Blue Star Line's liability under the duty to warn. In that case, the Fifth Circuit reviewed a district court decision finding the shipowner liable. *Id.* at 68. The hazard involved was a ladder that slipped because it "either had no rubber feet or the rubber feet were worn slick on the bottom." *Id.* at 68. The district court determined that the shipowner did not have actual knowledge of the hazard, but the shipowner should have known of the hazard because either (1) the shipowner failed to use due care to discover the hidden defect, or (2) the hazard was open and obvious. *Id.* at 69. The Fifth Circuit reversed the district court's decision. *Id.* at 71. According to the Fifth Circuit, neither of the district court's rationales for holding the shipowner liable were proper. *Id.* at 69–70. First, there was no evidence about the practices that constitute ordinary care with respect to inspecting ladders, so the district court was wrong to assume that ordinary care included inspecting ladders. *Id.* at 69. Second, while the court could find that a shipowner should have known of an obvious

hazard, the second half of the duty to warn states that even if a vessel owner has knowledge or constructive knowledge of a hazard, there is only a duty to warn if the hazards "are not known by the stevedore[,] and would not be obvious to or anticipated by him" *Howlett*, 512 U.S. at 98–99, 114 S.Ct. 2057. The Fifth Circuit held that, "if obvious, [a hazard] should have been as apparent to the stevedore as to the shipowner. It is contradictory to suggest that a careful shipowner should discover an apparent defect but that a careful stevedore may miss it with impunity." *Morris*, 832 F.2d at 69–70. In the present case, *Morris* does not act as a bar to Blue Star Line's liability. The evidence that Blue Star Line should have known of the differences in height in the archways is based on evidence in the record that the captain kept bumping his head on the archways (Dep. Pridmore at 26–27), and the crew of the ship was told of a longshore worker bumping his head (Dep. LaFrance at 32,34), among other facts. As discussed in the next section, a reasonable fact-finder could conclude from these facts that Blue Star Line should have discovered the differences of heights in the archways in the exercise of reasonable care. These facts

is supported by the language in *Hill*, which disagrees with the argument that constructive knowledge of the vessel owner implies obviousness to a stevedore:

> It is possible ... that the shipowner should have detected a defect in the lashing gear in the course of inspecting and maintaining the ship's stowage, per its customary duties. It is also possible that a defect in the seating of the lashing rod would not have been obvious to the longshoremen, in the reasonable exercise of their unloading duty. This could be due to the nature of the unlashing process, to the relative time spent with the gear, or to other differences between the role of the crew and the role of the longshoremen.

*Hill*, 2003 WL 23162396, at \*7, 2003 U.S. Dist. LEXIS 23723, at \*21. Therefore, the law does not preclude a finding that a duty to warn has been breached in this case, and I must look to the facts presented.

### 1. Vessel Owner's Constructive Knowledge of the Hazard

According to the Supreme Court, "[a]bsent actual knowledge of a hazard, then, the duty to warn may attach only if the exercise of reasonable care would place upon the shipowner an obligation to inspect for, or discover, the hazard's existence." *Howlett*, 512 U.S. at 100, 114 S.Ct. 2057 (citation omitted). Although in deciding *Serbin* the Third Circuit did not address the duty to warn, it did address the constructive knowledge of a vessel owner in analyzing the vessel owner's active operations duty. *Serbin*, 96 F.3d at 71. Under the active operations duty, the plaintiff must show, among other

proofs, "that the vessel appreciated, should have appreciated, or with the exercise of reasonable care would have appreciated, the condition". *Id.* In *Serbin*, the Third Circuit affirmed the trial court's determination that there was "sufficient evidence from which a jury could conclude that the shipowner—by way of the vessel's crew-knew or should have known [of the hazard, which was] that the block was stuck." *Id.* The relevant evidence included the fact that the crew had the task of moving the blocks, which could lead a jury to find that the crew should have discovered that the block was stuck in the normal exercise of their duties. *Id.*

In the present case, a reasonable jury could also conclude that the shipowner should have known that the arches varied in height and that the arch alleged to have caused the injury included a piece that was lower than the front of the archway. The plaintiffs have presented the following relevant evidence: the arches were different heights and the arch that allegedly caused the injury had a piece that was lower than the front of the archway (Pls.' Mem. Opp'n Summ. J. Ex. 6),[12] the configuration of the part of the vessel that included the archways was unchanged from 1970 to 2003 (Dep. Pridmore at 23–24), at least one longshore worker bumped his head on the archways and complained to the crew of the America Star about the height of the archways (Dep. LaFrance at 32,34), and even the captain bumped his hard hat on the archway at times (Dep. Pridmore at 26–27). Resolving all inferences in favor of the plaintiff, I conclude that a reasonable jury could find that the vessel owner,

---

do not, however, indicate that the differences in heights are obvious to or anticipated by the stevedore. Therefore, the facts in the present case do not preclude Blue Star Line's liability under the duty to warn.

**12.** At oral argument, plaintiffs stated that ribs in that archway were lower than the outside of the archway and presented a photograph of the archway to demonstrate that fact. The photograph they presented was photograph three which depicted a finger pointing to the rib or gusset in the archway.

in the exercise of reasonable care given the reports that people were bumping their heads and the length of time the archways existed, should have discovered the variations in height in the archways in the exercise of reasonable care.

### 2. Competent Stevedore's Inability to Recognize or Anticipate the Hazard

■ The issue of obviousness is often dispositive and precludes analysis of whether a competent stevedore could anticipate a hazard. *See e.g., Marino v. Kent Line International,* No. 03–4263, 2004 U.S.App. LEXIS, 12030, *6 (3d Cir. June 7, 2004) (finding that hazard was obvious where plaintiff admitted to observing it), *Kirsch,* 971 F.2d at 1033 (finding that plaintiff admitted that the hazard was obvious). In a recent decision where obviousness was not dispositive, the court analyzed the stevedore's ability to anticipate the hazard. *Mullen v. Alicante Carrier Shipping Corp.,* No. Civ. A. 02–6722, 2004 WL 1737493, at *5, 2004 U.S. Dist. LEXIS 15042, at *16 (E.D.Pa. Aug. 1, 2004). The hazard in that case was part of the cargo hold rather than the ship or its equipment. *Id.* at 2004 WL 1737493, *5, 2004 U.S. Dist. LEXIS 15042, *15. The court found that the stevedores should have been able to anticipate the hazard, a knot in the sling, because "the evidence overwhelmingly suggests that stevedores had encountered and safely dealt with knots in the past." *Id.* at 2004 WL 1737493, *5, 2004 U.S. Dist. LEXIS 15042, *16. The evidence included testimony by several stevedores and their supervisor that slings sometimes became stuck and they had a method they regularly employed to remove the stuck slings and testimony by the plaintiff that "on at least 100 prior occasions during the five years ... he encountered slings getting stuck.... He estimated that one-third of the time, the slings became stuck due to knots." *Id.* at 2004 WL 1737493, *5, 2004 U.S. Dist. LEXIS

15042, *17. There was further testimony by plaintiff that he and other longshore workers could safely use a forklift to disentangle a stuck sling. *Id.*

The evidence in the present case is much less one-sided. While there is evidence that the archways remained unaltered for many years (Dep. Pridmore at 23–24), the evidence does not indicate clearly that stevedores had safely dealt with the varying heights of the archways in the past. Plaintiff presents evidence that, in fact, the stevedores and the captain could not navigate the changing heights of the archways safely, but that they bumped their heads. (Dep. Prinski at 46, Dep. LaFrance at 32, Dep. Pridmore at 26–27.) The fact that there were no known serious injuries does not mean that the stevedores were navigating the archways safely. Furthermore, while stevedores knew that the archways were low on the vessel (Dep. LaFrance at 36), there is no evidence that they should have been able to anticipate that the height of the archways differed and that some pieces within an archway might be lower than the front of the archway. A reasonable jury could find that a competent stevedore would not be able to anticipate the hazards.

### C. The Active Operations Duty

■ Although plaintiffs also argue that defendant breached the active operations duty, I conclude that the defendant did not have an active operations duty in this case. The Third Circuit set forth a complete explanation of the active operations duty:

[T]o trigger the active operations duty, the vessel must have substantially controlled or been in charge of (i) the area in which the hazard existed, (ii) the instrumentality which caused the injury, or (iii) the specific activities the stevedore undertook. The purpose behind

the control/charge component is to ensure that the vessel is not held vicariously liable for injuries the stevedore causes and that the active operations duty does not supplant the turnover duty/duty to warn and duty to intervene in areas under the stevedore's control. Thus, for example, the vessel's mere reservation of the right to intervene to protect the ship's and its crew's interests, or to eject the stevedore at any time, does not amount to the substantial control necessary to trigger the vessel's active operations duty as long as the vessel does not exercise those reserved rights. A jury may find that the vessel exercised control or took charge over an area either because it never turned exclusive control of the area over to the stevedore but retained substantial control, or because the vessel substantially interfered ... with the stevedore's exercise of exclusive control, such as by actively intervening in the area."

*Davis,* 16 F.3d at 540–41 (citations omitted). Likewise, in *Mankus v. Swan Reefer I,* No. Civ. A. 02–3425, 2003 U.S. Dist. LEXIS 10263, at *29–30 (E.D.Pa. May 20, 2003), the court found that the active operations duty does not apply where there is no evidence that the crew "controlled the area" or "controlled the instrumentalities" or "actively participated in or supervised the discharging process." In sum, the court found that plaintiff presented "no evidence to support the notion that defendant retained any control whatsoever, much less substantial control, over the domain of the stevedoring operation once the unloading began." *Id.* at *30.

In the present case, plaintiffs have provided no evidence that the active operations duty applies. They have provided no evidence that the vessel failed to turn "exclusive control of the area over to the stevedore" or that the vessel "substantially interfered" with cargo operations. They have provided no evidence that the crew

controlled the area or participated in supervising the operations. Plaintiffs contend that Blue Star Line retained control over the archways since they had the duty to maintain the archway and since the stevedore had no authority to change the structure of the archway or lessen the danger. The Third Circuit contradicts this argument by providing that "the vessel's mere reservation of the right to intervene ... or to eject the stevedore at any time" is not sufficient to impose the active operations duty. *Davis,* 16 F.3d at 540–41 (citations omitted). Furthermore, the Third Circuit explains that the purpose of requiring the vessel to substantially control the area before imposing the active operations duty is to ensure that the "active operations duty does not supplant the turnover duty/duty to warn." *Id.* If the court accepted the plaintiffs' argument, the active operations duty would apply whenever the cargo operations were "related to" the structure of the ship, which would ensure that the active operations duty supplanted the turnover duty. Therefore, I find that defendant has no active operations duty in this case. Since Blue Star Line had no active operations duty, it could not have breached that duty.

## IV. CONCLUSION

The motion for summary judgment will be denied. Finding that the defendant had no active operations duty to plaintiffs, the case will proceed only on the basis of the turnover duty.

### *ORDER*

**AND NOW,** this _____ day of October 2004, it is **ORDERED** that defendant's motion for Summary Judgment (Docket # 40) is **DENIED.**